**MORRISON FLYING SERVICE, a Montana corporation, Appellant,**

v.

**DEMING NATIONAL BANK, a national banking corporation, Appellee.**

**No. 7750.**

United States Court of Appeals
Tenth Circuit.

Jan. 26, 1965.

A. W. Scribner, of Risken & Scribner, Helena, Mont. (Garland & Martin, Las Cruces, N. M., on the brief), for appellant.

Benjamin M. Sherman, Deming, N. M., for appellee.

Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.

HILL, Circuit Judge.

This appeal is from an order of summary judgment entered by the court below in favor of defendant-appellee and against plaintiff-appellant. The controversy is over the right of appellant, Morrison Flying Service (Morrison), to recover from appellee, Deming National Bank (Bank), for services performed by it under a subcontract with Cisco Aircraft, Inc. (Cisco).

The facts giving rise to the dispute are as follows: On April 23, 1962, Cisco entered into a contract with the United States Department of Agriculture, under the terms of which it agreed to spray, from the air, approximately 500,000 acres of national forest land located in the State of Montana. In return for these services, Cisco was to receive an agreed upon price payable upon completion of the aerial spraying operations in a manner satisfactory to the Government. Thereafter, Cisco contacted Morrison and requested it to provide search planes, pilots and other services to be used in performing the aerial spraying contract. On May 15, 1962, Morrison agreed to this and Cisco agreed to pay it a sum equal to $30 per airplane for each hour of service, which was to be paid within 48 hours after Cisco had received payment under its contract with the Government.

Morrison alleges that before commencing performance of the subcontract, it received information to the effect that Cisco had assigned, or was going to assign, the proceeds due on the aerial spraying contract with the Government to the Bank. It therefore wrote a letter to the Bank stating it understood such an assignment had been made and inquiring as to whether the provision in its contract with Cisco requiring payment within 48 hours was agreeable with the Bank.[1] In fact, Cisco did execute an "Instrument of Assignment" on May 21, 1962, in which it assigned to the Bank, all sums of money then due and to become due under the contract with the Government. The assignment was apparently given to the Bank as security for advancements of funds which the Bank had already made, or would in the future make, to Cisco.[2] On June 11, the President of the Bank replied to Morrison's letter stating that the Bank was acting as paying agent for all obligations assumed under the Government contract and assured Morrison that once the contract proceeds were received, the bills would be paid.[3]

Thereafter and allegedly in reliance upon this communication from the Bank, Morrison fully performed all of the obli-

1. That letter reads as follows:
   "It is our understanding that the Forest Service Contract for spraying the forests for spruce bud-worm has been assigned to your bank. We are sub-contractors under Cisco Aircraft, furnishing gas & oil as well as 5-8 Cessna 180 aircraft to be used as chase planes. The flying contract will probably be in the $6,000—$9,000 bracket and we are wondering if your bank could send us a letter assuring us of payment for our services.
   "Under our contract with Cisco, they have agreed to pay us within 48 hours of their payment of this Forest Service contract. Is this agreeable with your bank?"

2. The assignment provides, in part, as follows:
   "Assignor [Cisco] covenants that Assignor will receive all moneys advanced hereunder by the Bank as a trust fund to be first applied to the payment of claims of laborers, material men, subcontractors, and of other expenditures arising out of the performance of said contract, and until such payments have been made Assignor will not use any part of said advances for any other purpose * * *."

3. The letter states:
   "In regard to your inquiry on the Forest Service Contract between U.S. Forest Service and Cisco Aircraft. This contract has been assigned to the Deming National Bank and we are to act as paying agents for all the obligations assumed under this contract.
   "I can assure you that once the money is received from the Forest Service, we will pay all the bills submitted, without delay."

gations imposed upon it by its subcontract with Cisco and, as a result, Cisco became indebted to it in the amount of $14,424.81. On December 24, 1962, the Government paid to the Bank the entire proceeds due Cisco under the aerial spraying contract in the amount of $44,784. When Cisco refused to pay for its services, Morrison demanded payment from the Bank and this demand was also refused. Morrison then commenced this action against the Bank alleging that, by the letter of June 11, the Bank had guaranteed payment to it for the services performed under its subcontract with Cisco and prayed for judgment against the Bank in the amount of those services. The Bank's answer denied that payment had been guaranteed to Morrison and asserted certain other defenses. With issues thus joined, Morrison attempted to take the deposition of the President of the Bank. During the course of the deposition, the Bank's president refused to answer certain questions propounded to him by counsel for Morrison and it thereafter filed a motion to compel the witness to answer those questions. The Bank then filed a motion for summary judgment which the lower court granted without ruling upon the motion to compel the witness to answer the questions asked in the deposition. Morrison appeals.

■ We agree with the trial court and with appellee in that the letter of June 11 did not, in and of itself, constitute a guaranty of payment because of a lack of consideration. It was, in and of itself, a promise to pay but regardless of that promise, insofar as the present record discloses, Morrison was already obligated to perform the subcontract with Cisco and, after receipt of the letter, did only what it had contracted to do. However, the conclusion as to consideration does not dispose of the controversy. Rather, we are concerned with the entering of a summary judgment at a stage of the case when all of the facts and circumstances material to a just determination of the controversy were not before the court.

Morrison had pending before the court, on the date the summary judgment was entered, a motion to compel the President of the Bank to answer certain questions propounded to him in the course of the taking of his deposition by Morrison, and which he had refused to answer. These questions pertained to the various financial dealings between Cisco and the Bank, correspondence between the Government and the Bank concerning the Cisco contract with the Government and the manner in which the Bank disbursed the proceeds of the assigned contract. We do not conclude that these questions must be answered or that, if answered, they will finally permit Morrison to prevail in the case. The trial court should first have an opportunity to rule upon the matter. Nevertheless, some of this evidence may be very material for a final disposition of the litigation. It should be noted that Morrison alleges in the complaint: Its contract with Cisco was made on May 15, 1962, and it was to receive payment from Cisco within 48 hours after Cisco was paid by the Government; Cisco assigned the proceeds from the government contract to the Bank on May 21; and it did not commence performance of its contract with Cisco until after it received the June 11 letter from the Bank and then only by reason of its reliance upon the Bank's promise to pay. If the evidence, as eventually adduced, shows a factual situation whereby Morrison had legal grounds to abstain from performance of its contract with Cisco until it had assurance of being paid and that Morrison's performance of the contract constituted a benefit to the Bank, consideration may well be found to exist.

Moreover, Morrison may be able to prove a case under some legal theory other than guaranty. Its proposed theories of promissory estoppel and constructive trust are sufficiently alleged in the complaint and they, or some other legal or equitable theory, may find factual support from evidence available but not before the court at the time summary judgment was granted.

■■ It is, of course, the duty of the trial court to grant a motion for summary judgment in an appropriate case but such

relief is drastic and should be applied with caution to the end that litigants will have a trial on bona fide factual issues. Bushman Construction Company v. Conner, 10 Cir., 307 F.2d 888. In determining whether to grant the motion, the court must consider the case as a whole, including the allegations of the complaint as well as the affidavits and other evidence before it. Bushman Construction Co. v. Air Force Academy Housing, Inc., 10 Cir., 327 F.2d 481; Thompson v. United States, 10 Cir., 312 F.2d 516, cert. denied, 373 U.S. 912, 83 S.Ct. 1303, 10 L.Ed.2d 414. And, it should not be granted where, as here, there are genuine issues of fact to be determined. United Mine Workers of America, District 22 v. Roncco, 10 Cir., 314 F.2d 186, and cases therein cited.

The order granting summary judgment is reversed and the case is remanded for further proceedings.